THE CITY OF AURORA, Plaintiff and Counterdefendant-Appellant, v. JUVENTINO NAVAR, Defendant and Counterplaintiff-Appellee.

Second District   No. 2—90—0657

Opinion filed March 8, 1991.

Ronald R. Moses, Corporation Counsel, of Aurora (Valerie D. Brown, of counsel), for appellant.

Murphy, Hupp, Foote, Mielke & Kinnally, of Aurora (Patrick M. Kinnally, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff and counterdefendant, the City of Aurora (Aurora or City), appeals from orders of the circuit court of Kane County which permanently enjoined the City from enforcing its noise nuisance ordinance and awarded attorney fees to defendant and counterplaintiff, Juventino Navar (Navar).

Navar is the owner of Navar's Auto Service, an auto repair garage, in the City of Aurora. Navar's business is a permitted use under Aurora's zoning ordinance. On September 25, 1989, Navar was contacted by Mark Anderson, the director of the division of inspections and permits for the City, and told to close the garage because it was after 9 p.m. and a City ordinance required that his business be closed after 9 p.m.

Either later in September or early in October 1989 Anderson came to Navar's garage accompanied by two police officers. Jesus Navar, Juventino's uncle, was there, watching over the business while his nephew was out on the tow truck. Anderson told Jesus that the garage would have to be closed for the evening since it was in violation of the 9 p.m. closing time mandated by the City ordinance.

On November 7, 1989, the Aurora City Council amended section 21—20 of its nuisance ordinance (Aurora, Ill., Code of Ordinances ch. 21, §21—20 (1969)) by adding a noise nuisance. (Aurora, Ill., Ordinance 89—108 (November 7, 1989).) Navar received a copy of the amended ordinance from Anderson around the fourth or fifth of December 1989.

Aurora filed a complaint against Navar on December 11, 1989, alleging that on November 29, 1989, he had operated his auto repair shop in such a manner as to constitute a noise nuisance in violation of section 21—20 of the City's nuisance ordinance. Navar did not answer but filed affirmative defenses and a counterclaim. In his counterclaim Navar sought a declaratory judgment that ordinance 89—108, the noise ordinance, was unconstitutional, both on its face and as applied to him, under the due process clauses of both the Illinois and United States Constitutions. (Ill. Const. 1970, art. I, §2; U.S. Const., amend. XIV.) Navar attacked the ordinance on grounds that it was so vague and/or overly broad as to deny him due process of law. He also requested that the City be enjoined from prosecuting him under the challenged ordinance and that he be awarded attorney fees and costs.

At the hearing on Navar's subsequent motion for a permanent injunction both parties presented evidence. With regard to the incidents which occurred *before* the City amended its nuisance ordinance, Navar testified that on September 25, 1989, Anderson first telephoned him at home while he was preparing to eat supper. Upon Anderson's insistence that the garage had to be closed immediately because it was after 9 p.m., Navar returned to his shop. Later that evening Anderson made repeated calls to Navar at the shop to verify that Navar was closing. According to Navar, Anderson ultimately threatened him with arrest if he did not comply. When Navar asked about the closing time law, Anderson told him it was a new ordinance and indicated that he would send Navar a copy of it. Jesus Navar testified that during the incident when he was at the garage, Anderson also told him he had to close the business or be arrested.

Anderson, testifying for Aurora, indicated that he had been a City zoning enforcement officer for almost two years prior to becoming director of the City's division of inspections and permits in 1986. Anderson's testimony deviated slightly from Navar's in regard to the dates of the incidents which Navar had described. However, Anderson admitted making repeated calls to Navar at his place of business on one occasion and to being accompanied by two police officers when he confronted Jesus Navar. He denied ever threatening that anyone would be arrested but acknowledged that he had indicated that "the

police could be contacted and have him closed down." Anderson testified that, on the occasions he contacted Navar, he had received complaints that Navar's garage was open in the evening. In response to questioning by the court, Anderson admitted that the complaints that had prompted both him and the police to go to Navar's garage had all come from a single complainant.

It was undisputed that the particular ordinance Anderson sought to enforce in September and October had not yet been adopted by the City council. Anderson testified that he thought the ordinance was in effect on the occasions he contacted Navar prior to November 7, 1989.

Navar also testified regarding incidents which occurred *after* the nuisance ordinance was amended. On November 29 a police officer came to the garage and told Navar he had received complaints of noise. The officer indicated that he himself had been standing outside but had not heard any noise. Around December 9 or 10, at about 9:30 p.m., Navar again was contacted by police. According to Navar, he was changing the oil in his own van inside his garage, which had been closed for the night, when four squad cars pulled into the garage parking lot. Two of the officers called him outside and told him they had received complaints of noise coming from his garage. Navar explained that he was merely changing the oil in his vehicle and not making noise. The officers gave him a warning regarding noise and left. It was not contested that Navar was never sent a notice to abate after the ordinance went into effect.

At the conclusion of the hearing the trial court granted Navar's motion and permanently enjoined Aurora from enforcing its noise ordinance against Navar. The judge's oral remarks indicate that he granted injunctive relief on the basis that Aurora had selectively enforced its noise ordinance against Navar. While the court indicated its belief that the constitutional issues were well raised, it did not render a judgment as to the constitutionality of the challenged ordinance.

Navar subsequently filed a petition for attorney fees and costs which was initially denied. Navar then filed a post-trial motion asking the court to reconsider its decision and resolve the important constitutional issue which had been raised. The court granted the motion and ultimately found, among other things, that the City's noise ordinance was unconstitutional in that it improperly deprived Navar of a protected property interest in his business, denied him equal protection of the law, and was vague and overly broad. The ordinance was declared unconstitutional on both State and Federal constitutional grounds. The City was enjoined from any enforcement of the ordi-

nance and Navar was awarded attorney fees and costs. Aurora then filed this appeal.

■■ Initially, Aurora asserts that the trial court erroneously ignored the presumption of validity enjoyed by the City's ordinance. (See *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 66; *Village of Glenview v. Velasquez* (1984), 123 Ill. App. 3d 806, 809.) We note, however, that the City does not cite to any portions of the record to support its assertion that the trial court ignored these principles. Rather, it cites to the locations in the record where it raised this issue in the lower court. Evidently, since the trial judge did not specifically mention it in his oral or written rulings, the City assumes that he ignored the rule regarding presumptive validity altogether. The record does not support such an assumption.

In its written order holding the order unconstitutional, the trial court stated: "The court has carefully reviewed the memoranda and pleadings as well as its own notes relating to the hearing held. The court has also considered the arguments presented." The City had first pointed out the presumption of validity due its ordinance in its response to Navar's motion for a temporary restraining order. It again raised the issue in the memorandum of law it submitted to the court in opposition to Navar's motion for a permanent injunction. The trial court explicitly stated that it had reviewed the memoranda and pleadings. On these facts we are confident the lower court took into consideration the presumption set forth by the City.

The City next challenges the trial court's findings that the noise ordinance is unconstitutionally vague and overly broad. As a preliminary matter we note that in his counterclaim Navar alleged and sought relief specifically in relation to Aurora's ordinance 89—108. The trial court's declaration of unconstitutionality was precisely limited to ordinance 89—108. In this court the parties' arguments focus on ordinance 89—108. The ordinance in question amended a section of the City's nuisance ordinance by adding, in pertinent part, the following language: "Any commercial activity audible from adjacent premises, or conducted out-of-doors, after 9 p.m. is declared a nuisance." The complaint charging Navar indicates that the offense was an "unlawful Nuisance Noise" and was brought pursuant to section 21—20 of the City's Code of Ordinances (Aurora, Ill., Code of Ordinances ch. 21, §21—20 (1969)). Section 21—20 is the section that was amended by ordinance 89—108. According to the complaint, Navar "unlawfully allowed a repair garage to operate *** in such a manner as to be a noise nuisance after the hour of 9 p.m." It is apparent from the record that the only portion of Aurora's Code of Ordinances that

is in real controversy is the language regarding noise from commercial activity, which was added by ordinance 89—108 and which the parties refer to as the "noise ordinance." Nevertheless, Navar also attacks, and the trial court addressed, the language of section 21—20 which declares as a nuisance, conditions "offensive to the neighborhood." This language, however, was part of section 21—20 prior to amendment and was not altered by ordinance 89—108. Accordingly, we will limit our inquiry to the "noise ordinance" as added by ordinance 89—108.

■ As we have already mentioned, there is no question, and Navar does not dispute, that a municipal ordinance is entitled to a presumption of validity (*City of Evanston v. Ridgeview House* (1976), 64 Ill. 2d 40, 66) and the party challenging an ordinance has the burden of showing its invalidity. (*Village of Glenview v. Velasquez* (1984), 123 Ill. App. 3d 806, 809.) Navar attacks the validity of the ordinance on the ground that its provisions do not establish any objective standards for determining what is denoted by the word "audible." He points out that, under this word, *any* noise resulting from commercial activity after 9 p.m. could become a nuisance, as long as the noise could be heard by a next-door neighbor. He further asserts that the ordinance lacks any standards or guidelines as to what constitutes a violation and thereby encourages enforcement officers to make arbitrary decisions as to when a violation has occurred. In short, Navar suggests that under its noise ordinance Aurora could, for whatever reasons it chose, find a nuisance where, in fact, there was none. We think Navar has met his burden of showing the invalidity of ordinance 89—108.

In finding Aurora's noise ordinance to be vague and overly broad, the trial court singled out the failure of the ordinance to define or delineate any sort of measurement as to when commercial activity is or becomes "audible." The City brushes aside the lower court's vagueness objections by reciting dictionary definitions of the challenged terms and asserting, with little further support or argument, that the terms can be easily comprehended by a reasonable person of average intelligence and, therefore, are not unduly vague. We think the City misses the thrust of a constitutional due process inquiry.

■ Due process is violated if a law is so vague and devoid of standards as to leave the public unsure of what is and is not prohibited (*Bastian v. Personnel Board* (1982), 108 Ill. App. 3d 672, 676) or if it fails to supply adequate guidelines to the administrative body which must enforce it. (*People ex rel. Stamos v. Public Building Comm'n* (1968), 40 Ill. 2d 164, 174; *Bastian*, 108 Ill. App. 3d at 676.)

The language of an ordinance must convey sufficiently definite warning and fair notice of what conduct is proscribed, and whether notice is adequate is measured by common understanding and practices. (*City of Collinsville v. Seiber* (1980), 82 Ill. App. 3d 719, 725.) While we agree with Aurora that "we can never expect mathematical certainty from our language" (*Grayned v. City of Rockford* (1972), 408 U.S. 104, 110, 33 L. Ed. 2d 222, 228-29, 92 S. Ct. 2294, 2300), we are of the opinion that those to be regulated by it are entitled to far more certainty than is now provided by the City's noise ordinance, which provides neither the notice nor the standards required by due process guarantees.

The ordinance prohibits commercial activity which is "audible" from "adjacent premises." As the City points out, it is commonly understood that sound is audible if it is loud enough to be heard and adjacent premises are those which share a common border with the premises in question. The City concludes that the ordinary, everyday meanings of these words adequately convey to a reasonable person of average intelligence what is prohibited by the ordinance. We do not agree. The problem here is not with the meaning of the individual words that are used but, rather, that the words used do not set forth a nuisance as that term is commonly understood.

■ A nuisance at common law is something which unlawfully annoys or does damage to another. (*Belmar Drive-In Theatre v. Illinois State Toll Highway Comm'n* (1966), 34 Ill. 2d 544, 546; *City of Chicago v. Reuter Brothers Iron Works, Inc.* (1947), 398 Ill. 202, 206.) Also, "[a] nuisance is something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable." (*Rosehill Cemetery Co. v. City of Chicago* (1933), 352 Ill. 11, 30.) It is patently unreasonable to suppose that the City intended that any and all commercial activity which creates noise after 9 p.m. should be declared annoying or offensive and, therefore, a nuisance merely because the noise can be heard nearby. Conversely, it is obvious the City meant to prohibit those commercial activities that create a kind or volume of noise which amounts to a nuisance when imposed upon neighbors after 9 p.m. However, because of the way the ordinance is drafted, *all* commercial activity which is audible from adjacent property after 9 p.m. is a nuisance and thus subject to prosecution. As suggested by the trial court, examples of unlikely commercial activity that might trigger enforcement of ordinance 89—108 are tow trucks driving on City streets between all-night garages and accident scenes; car doors being closed after 9 p.m. in the parking lots of all-night or late-night convenient stores such as 7-Eleven; and even the talking and laughter

which often occurs near the entrances to various late-night establishments. This dichotomy between the actual wording of the ordinance and what might be reasonably expected by a person subject to the ordinance vividly illuminates the ordinance's weakness.

There is no language in ordinance 89—108 by which a commercial activity can judge whether the noise it generates is of a kind or volume to constitute a nuisance. There is not even an indication of whether a nuisance in a commercial area is to be differentiated from a nuisance in a residential area. Absent guidelines, the business owner or operator, who is subject to the ordinance, is forced to decide for himself whether noise from the business is sufficient to be a nuisance and thus to trigger enforcement of the ordinance. The owners/operators then face a dilemma because, if they gauge incorrectly and the City determines they are in violation, they may be prosecuted despite their best efforts to comply. The language of the ordinance, even when considered in its everyday context, fails to convey what constitutes a nuisance and what, therefore, is prohibited. Like statutes, an ordinance violates due process guarantees when its terms "are so incomplete, vague, indefinite and uncertain that men of ordinary intelligence must necessarily guess at their meaning and differ as to their application." (*Krebs v. Thompson* (1944), 387 Ill. 471, 477; see also *Spinelli v. Immanuel Evangelical Lutheran Congregation, Inc.* (1986), 144 Ill. App. 3d 325, 331.) The trial court correctly found ordinance 89—108 to be impermissibly vague.

■■ Just as the ordinance leaves those to be regulated without fair warning of what they may or may not do, so also it leaves those charged with its enforcement with no direction as to when a violation occurs. Absent guidelines within the ordinance itself as to when or what kind of noise amounts to an actionable nuisance, an enforcement officer is free to decide, strictly on his own, whether the noise complained of in a given situation constitutes a breach of the ordinance. Since he need not adhere to any standards, it is clear that the officer might find a violation where there exists no nuisance in fact. Reliance on the unbridled discretion of administrative officials fosters the arbitrary and discriminatory enforcement which is prohibited by both the State and Federal Constitutions. *Grayned v. City of Rockford* (1972), 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 227-28, 92 S. Ct. 2294, 2299.

The conclusion we reach is consistent with prior decisions regarding similar noise ordinances. In *City of Chicago v. Reuter Brothers Iron Works, Inc.* (1947), 398 Ill. 202, 206, a zoning ordinance restricting noise of a "disagreeable or annoying nature" withstood a due process vagueness challenge. The court found that the words "disagree-

able" and "annoying" had a well-established meaning in the definition of a common-law nuisance (*Reuter*, 398 Ill. at 206-07), thereby sufficiently setting forth the duty of those to be regulated. *Reuter* was determinative in upholding an ordinance against a constitutional challenge in *Dube v. City of Chicago* (1955), 7 Ill. 2d 313. The *Dube* ordinance was very similar to the one in *Reuter*, except that the noises to be prohibited in *Dube* were those "disturbing the peace and comfort of occupants of adjacent premises." (*Dube*, 7 Ill. 2d at 324.) The court in *Mister Softee of Illinois, Inc. v. City of Chicago* (1963), 42 Ill. App. 2d 414, discussed a vagueness challenge to an ordinance which prohibited making noise which was "distinctly and loudly audible" on public streets. While the court noted that it had no authority to pass on constitutional questions, it found that there was no debatable constitutional question as to the validity of the ordinance and dissolved an injunction which had enjoined the City from enforcing the ordinance as applied to the plaintiffs. An ordinance which prohibited "loud and raucous sounds" was challenged on the ground that the word "raucous" was impermissibly vague in *Town of Normal v. Stelzel* (1982), 109 Ill. App. 3d 836. The court, in upholding the ordinance, relied on *Kovacs v. Cooper* (1949), 336 U.S. 77, 93 L. Ed. 513, 69 S. Ct. 448, where the court had rejected a vagueness challenge to an ordinance prohibiting "loud and raucous noises." While it had characterized the phrase "loud and raucous" as abstract, the *Kovacs* court found that these words had acquired an everyday meaning which sufficiently conveyed what conduct was proscribed by the ordinance.

■■ ■ The key difference between the ordinances discussed above and Aurora's ordinance 89—108 is that every one of the cited ordinances includes language which limits broad and general words like "sound," "noise," or "audible" in such a way that a nuisance is delineated. The limiting words make it possible to discern when the "audible" sound amounts to a nuisance in fact. As we have pointed out, although not *all* noise which can be heard from commercial activity after 9 p.m. constitutes an actual nuisance, under Aurora's ordinance all audible noise created by commercial activity after 9 o'clock at night may be subject to prosecution. Under its ordinance as it is drafted, Aurora is far too free to find a nuisance when, in fact, there is none. A city has no power to declare that to be a nuisance which is not a nuisance in fact. (*Dube*, 7 Ill. 2d at 325; see also *Rosehill Cemetery Co. v. City of Chicago* (1933), 352 Ill. 11.) The failure of ordinance 89—108 to provide guidance to either those charged with com-

pliance or those charged with its enforcement draws us to the inevitable conclusion that the ordinance is unconstitutional on its face.

The trial court also found ordinance 89—108 to be overly broad. While both parties address this issue, both also agree that there is considerable doubt as to the applicability of the overbreadth doctrine to the commercial activity addressed by the ordinance. (See *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 71 L. Ed. 2d 362, 102 S. Ct. 1186.) Moreover, we note that the City gives the issue only cursory treatment, and Navar's argument goes more to vagueness than to overbreadth. In any event, we need not address this issue since we have already found the language of the ordinance to be so vague and uncertain as to be offensive to due process.

■ The City makes a lengthy argument that error occurred at the trial level because the court below granted injunctive relief to Navar as a result of the court's own bias and prejudice rather than as a result of careful consideration of the evidence and law introduced at the hearing. In light of this serious charge, we have carefully reviewed all pertinent parts of the record and conclude that there is no basis for the City's claim. First of all, we reiterate and expand upon what we said earlier: despite the City's insistence to the contrary, there is absolutely no indication that the trial court ignored any of the evidence or law which was presented to it. On the contrary, both the court's oral comments and its written findings indicate that it considered very carefully both the facts presented to it and the law relied upon by counsel.

We recognize, and it is readily apparent from the report of proceedings, that the trial court was disturbed by this case. It can be inferred from his comments that the judge was disturbed by the City's attempt to enforce a nonexistent ordinance and by what appeared to him to be personal motivation for selective and vigorous enforcement against Navar. However, it is also clear from his own remarks that by the time of the hearing on the post-trial motion the judge had become keenly aware of his own reactions to the testimony he had previously heard, had reviewed the file on the case in considerable depth, and had given the matter serious thought. Only after all of this did he conclude that it was necessary to decide the constitutional question raised by Navar. At the conclusion of the hearing itself the court again mentioned the way Mr. Navar's situation had been handled but then made a clear transition to his discussion of the constitutional problems with the ordinance. On these facts we cannot say the trial

court's decision sprang from his personal feelings regarding this case. The City's assertions in this regard are not justified.

We turn now to the City's contention that the award of attorney fees to Navar, in the amount of $2,365, was improper. In his prayer for relief Navar asked for fees and cited section 1988 of the Civil Rights Attorney's Fees Awards Act of 1976 (section 1988) (42 U.S.C. §1988 (1988)), which provides for fee awards in civil rights cases. Aurora first attacks the award on the ground that section 1988 is not applicable because Navar did not plead a cause of action under either section 1983 of the Civil Rights Act (section 1983) (42 U.S.C. §1983 (1988)) or any of the other Federal statutes, as specifically set forth in section 1988, whose enforcement may merit a fee award. Aurora further asserts that attorney fees are not available in declaratory judgment actions such as this one. Navar responds that he never sought fees under either the declaratory judgment statute (Ill. Rev. Stat. 1987, ch. 110, par. 2—701 *et seq.*) or section 1983. Rather he contends that he is entitled to fees under a provision of the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 1—1—1 *et seq.*) or, alternatively, directly under section 1988. We disagree with Navar on both counts.

The section of the Illinois Municipal Code invoked by Navar, section 11—13—15 (Ill. Rev. Stat. 1987, ch. 24, par. 11—13—15), permits adversely affected owners or tenants of real property to bring an action attacking zoning and building violations on neighboring real property. The cause of action extends also to the proper municipal officials. Among other things, such an action may be brought "to prevent illegal activity on the property involved." Successful plaintiffs in these actions are to be awarded attorney fees. Navar attempts to bootstrap himself into the position of a plaintiff under this statute by asserting that he brought a successful suit to prevent illegal activity by the City directed at his property. He contends that his suit revealed, and secured a remedy against, the City's illegal attempts to enforce a nonexistent ordinance and its unlawful attempt to prosecute him under its ordinance without giving prior notice to abate the alleged nuisance. Navar's argument asserts a tortured and insupportable reading of the statute.

■■ ■ Under section 11—13—15 municipalities have the power to enforce zoning and building ordinances in order to promote public health, welfare and safety. (*Launius v. Najman* (1984), 129 Ill. App. 3d 498, 502.) The statute extends this enforcement authority to adjacent landowners or tenants for the purpose of affording relief to private citizens whose municipal authorities are slow or reluctant to act (*Launius*, 129 Ill. App. 3d at 502), or where the interests of the mu-

nicipality and general public differ from the interests of the private citizens (*City of Chicago v. Westphalen* (1981), 93 Ill. App. 3d 1110, 1130), and it gives an adjacent landowner a private right of action against a private violator. (*Heerey v. Berke* (1989), 179 Ill. App. 3d 927, 934.) The award of attorney fees under section 11—13—15 is a permissible sanction imposed by the statute to secure compliance with local building and zoning ordinances. (*Pasfield v. Donovan* (1956), 7 Ill. 2d 563, 568; *Launius*, 129 Ill. App. 3d at 502.) Clearly, the statute is intended to give property owners a legal tool to attack detrimental neighborhood ordinance violators when the municipality has not done so. Navar, however, is not attempting to secure compliance with any building or zoning ordinance by a private violator. Absent an ordinance violation, there is no purpose for imposing the sanction of an attorney fee award.

In addition, the statute does not attempt to enable property owners to reach the kinds of violations which Navar attributes to the City. Plaintiff in *Heerey* invoked section 11—13—15 in an attempt to enjoin the City of Chicago from issuing building permits. The complaint, which was dismissed for failure to state a cause of action, alleged that the City had allowed unlawful construction due to its failure to enforce the conditions and requirements in its own municipal permits. In affirming the dismissal of the complaint, the court recognized that the statute allows either the city or an adjacent landowner to proceed against zoning ordinance violators but added that it does not provide a cause of action against the city by a landowner. Plaintiff argued that section 11—13—15 permits a cause of action against the city since it does not preclude such an action. The court responded that this argument was "contrary both to the language of the statute and to the rules of statutory construction, which provide that the plain and obvious meaning of a statute may not be enlarged by the court. *Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 84, 256 N.E.2d 758." (*Heerey v. Berke* (1989), 179 Ill. App. 3d 927, 934.) In our view the meaning of section 11—13—15 is as plain and obvious now as it was when considered by the *Heerey* court. It did not then provide a cause of action to ensure a city's compliance with its own ordinances, such as that proposed by Navar, and we decline to enlarge its meaning now. Navar's recourse to section 11—13—15 is of no avail.

Navar's reliance on *City of Champaign v. Roseman* (1958), 15 Ill. 2d 363, is misplaced. As Navar notes, in *Roseman* the city was awarded attorney fees under a predecessor statute of section 11—13—15. However, the former law, section 73—9 of the Revised Cities and Villages Act (Ill. Rev. Stat. 1957, ch. 24, par. 73—9), provided that if

relief was granted under the section the court could allow "the plaintiff" an attorney fee award. No distinction was made between plaintiff local authorities and plaintiff owners or tenants. In contrast, section 11—13—15 (Ill. Rev. Stat. 1987, ch. 24, par. 11—13—15), while it still provides the local municipality with a cause of action, also states that the plaintiff shall be awarded attorney fees "[i]f an owner or tenant files suit" pursuant to the section and the court finds in plaintiff's favor. Since owners and tenants are specifically named while municipalities are not, it appears the present statute is designed to provide attorney fee awards to plaintiff property owners or tenants but not to municipal plaintiffs. Thus, regardless of what was awarded to the city in *Roseman*, a plaintiff municipality would not be likely to collect a fee award under the statute as relied upon by Navar.

▇▇ Navar also claims he is entitled to attorney fees under section 1988, which provides in pertinent part:

"In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92—318 [20 U.S.C. 1681 et seq.], or title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d *et seq.*], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (42 U.S.C. §1988 (1988).)

Navar states that he never pleaded or argued in the trial court that he was seeking relief under section 1983, nor does his counterclaim reveal that he pleaded any of the other civil rights statutes mentioned in section 1988. Plaintiff appears to argue that section 1988 is applicable merely because he prevailed on his constitutional challenge and that invocation of the Federal statutes mentioned within section 1988 is not necessary. We do not agree.

▇▇ The fee award portion of section 1988 does not in any way create a cause of action. Nor does it imply that it awards fees for actions brought to enforce specific constitutional provisions. Rather, it relates directly to the causes of action which arise under the statutory sections named within itself. Accordingly, we believe that plaintiffs seeking section 1988 fees must in some way invoke the statutes whose enforcement is encouraged by section 1988.

It may be that plaintiffs are not required to specifically identify in their pleadings, or specifically rely upon, one of the provisions set forth in section 1988 in order to prevail on a motion for section 1988 attorney fees. (*Americans United for Separation of Church & State v. School District* (6th Cir. 1987), 835 F.2d 627, 631.) It does not follow, however, that plaintiffs' pleadings and arguments need have no con-

nection at all to the statutory provisions named in section 1988. In *Americans United* the court held that attorney fee awards are proper under section 1988, despite the absence of explicit pleading of, or reliance on, or even reference to one of the statutes named in the section, as long as the pleadings and evidence present a substantial fourteenth amendment claim which is related to the prevailing party's ultimate success and for which section 1983 provides a remedy. (*Americans United*, 835 F.2d at 631.) Although the complaint in *American United* did not refer to any of the civil rights statutes listed in section 1988, it pleaded a jurisdictional statute which closely tracked the language of section 1983 and had been described by the United States Supreme Court as the " 'jurisdictional counterpart' " of section 1983. (*Americans United*, 835 F.2d at 632, quoting *Lynch v. Household Finance Corp.* (1972), 405 U.S. 538, 543, 31 L. Ed. 2d 424, 429, 92 S. Ct. 1113, 1117.) Too, plaintiffs' complaint, while it did not specifically rely on section 1983, made the allegations essential to state a cause of action under section 1983. The court concluded that plaintiffs had prevailed in what was essentially an action to enforce a provision of section 1983 and thus had sufficiently satisfied the requirements of section 1988 to warrant a fee award.

█ Like the complaint in *Americans United*, Navar's complaint fails to specifically allege reliance on any of the statutes listed in section 1988. Unlike the *American United* plaintiffs, however, who strove to fit their complaint into the parameters of a section 1983 action, Navar appears to disclaim such an action when he declares to this court that he "never pleaded or argued in the trial court that he was seeking relief under 42 U.S.C. §1983." Nowhere does counterplaintiff attempt to show that his complaint substantially states a cause of action under any of the statutes named in section 1988. Nor does his complaint on its face track the statutory language in order to reflect a section 1983 action and, thus, merit the fees awarded him by the trial court. In short, Navar has offered no basis for sustaining his fee award.

█ Navar is not aided by his citation of *Florida Pawnbrokers & Secondhand Dealers Association, Inc. v. City of Fort Lauderdale* (S.D. Fla. 1989), 711 F. Supp. 1084, since there was no issue raised there as to whether any of the section 1988 statutory provisions had been relied on. Indeed, the opinion makes no mention of the basis on which fees were requested. On the other hand the court discussed section 1983 liability and applied it to the City. Thus, we think it likely that section 1983 had been raised by plaintiffs. Since Navar has

shown no basis for the fees granted to him by the trial court, we conclude that the fee award was improper and must be reversed.

Based on the reasons stated above, we affirm that part of the order of the circuit court of Kane County which granted a permanent injunction against enforcement of ordinance No. 89—108 by the City of Aurora. We reverse the portion of the order which granted attorney fees to the counterplaintiff.

Affirmed in part; reversed in part.

McLAREN and GEIGER, JJ., concur.