CITY OF JEWELL JUNCTION, Iowa, Appellee,

v.

Michael D. CUNNINGHAM and Linda Cunningham d/b/a East Lane Manor, Appellants.

No. 88–362.

Supreme Court of Iowa.

April 19, 1989.

Rehearing Denied May 12, 1989.

Carol A. Wendl of Neiman, Neiman, Stone & Spellman, P.C., Des Moines, for appellants.

Charles Deppe of Brekken, Deppe & Wynia, P.C., Jewell, for appellee.

LARSON, Justice.

Michael and Linda Cunningham are the owners of East Lane Manor, a residential care facility located in a residential district in Jewell Junction, Iowa. (Jewell Junction is commonly known as Jewell.) The district court enjoined the operation of East Lane Manor on the ground that it violated the city's zoning ordinance, and the Cunninghams appealed. We reverse and remand.

When the city's zoning ordinance was passed in 1971, East Lane Manor had already been in operation for approximately four years. Nevertheless, the ordinance impacted on East Lane in several respects: First, it designated the area where East Lane was located as R–2, or residential, with certain exceptions for "accessory uses," including nursing or convalescent homes and rest homes.

A nursing or convalescent home is defined by the ordinance as

> [a] building or structure having accommodations and where care is provided for invalid, infirm, aged, convalescent, or physically disabled persons, *not including insane or other mental cases*, inebriate or contagious cases.

(Emphasis added.) A rest home is defined by the ordinance as

> [a] home operated as a boarding house, and in which nursing, dietary and other personal services are furnished to convalescents, invalids and aged persons, *but in which no persons suffering from a mental sickness, disease, disorder or ailment* or from a contagious or communicable disease are kept, and in which no surgical or other primary treatments

such as are customarily provided in sanitariums or hospitals are performed.

(Emphasis added.)

Second, the ordinance provided exceptions for nonconforming uses which existed at the time of the enactment of the ordinance. This "grandfathering" of existing uses lies at the heart of this case.

When the city sought an injunction based on alleged violations of the ordinance, Cunninghams responded that (1) the ordinance is unconstitutionally vague; (2) East Lane falls into one of the accessory uses as a "rest home" or a "nursing or convalescent" home; (3) the city is barred by laches and estoppel from enforcing the ordinance; and (4) Cunninghams' use of the property predated the ordinance, and the operation of the facility is therefore a legal nonconforming use. Because we hold for Cunninghams on the nonconforming use issue, it is unnecessary to resolve the other three issues.

The city argues that more than eight persons currently reside in East Lane Manor who suffer from mental disorders, and Cunninghams are therefore in violation of the ordinance. The number eight is significant because, under Iowa Code section 414.22(2)(b), a city zoning ordinance may not prohibit in a residential zone any facility with eight or fewer residents who are physically or mentally impaired.

Cunninghams' response is that, if more than eight of the present residents are suffering from mental conditions, this is nothing new, that eight or more such persons have resided in East Lane Manor at all times—from the beginning of its operation, through the time the ordinance was passed, and up to the time of trial. The present use is therefore only a continuing, nonconforming use and not subject to injunction. They also contend that, in the beginning of East Lane Manor's operation when it was caring largely for elderly people, "mental" problems were common, usually caused by senility, strokes, or Alzheimer's Disease.

The zoning ordinance provides for continued nonconforming uses in this language:

The lawful use of a building existing at the time of the enactment of this Ordinance may be continued even though such use may not conform with the regulations of this Ordinance for the district in which it is located. Any use in existence at the adoption hereof which was not an authorized "nonconforming use" under previous Zoning Ordinances, shall not be authorized to continue as a nonconforming use pursuant to this Ordinance, or amendments thereto.

Our resolution of the question of nonconforming use turns on how tightly the Cunninghams must be held to the original use of their property. The city produced evidence of a change in East Lane Manor away from the care of elderly persons toward the care of younger residents with records of mental illness and who are potentially more aggressive. In recent years, increased numbers of "releases" to East Lane Manor from mental hospitals have resulted in an influx of patients who, according to a psychiatrist, would continue to exhibit signs of mental illness.

One former employee, who started work for East Lane Manor in 1982 and left in 1985, testified that

when I first started, there was a lot of people that were elderly that just basically needed someone to help take care of them. And as—over the three years I went on, these elderly people were replaced with people that had a tendency to be violent and show behavior that I wasn't comfortable with.

. . . .

Q. In terms of numbers, how many young people or younger people as you've described them, with a tendency to be violent or whatever, were there in March of 1982? A. I would say 4, 5, or 6 were in there. I didn't think that they had the violent tendency as what came there later.

Q. And when you left in March of '85, how many would you say had a—were younger and had more aggressive behavior? A. Basically all but one.

The city has the burden of proving a violation of the ordinance. *City of Central City v. Knowlton*, 265 N.W.2d 749, 753 (Iowa 1978). A party who asserts a nonconforming use has the burden to establish the lawful and continued existence of the use, and once the preexisting use has been established by a preponderance of the evidence, the burden is on the city to prove a violation of the ordinance by exceeding the established nonconforming use. 8 A. McQuillin, *The Law of Municipal Corporations* § 25.188(a), at 50 (1986) (hereinafter referred to as McQuillin); 101 C.J.S. *Zoning & Land Planning* § 154, at 475–77 (1979).

This court has not decided a case close to this on the facts, but it has been suggested that considerable latitude will be allowed a landowner in making changes in the original nonconforming use if the changes are not substantial and do not impact adversely on the neighborhood. In *Central City*, for example, we held that an original nonconforming use as a salvage and junk yard was preserved, even though the inventory of junk and salvaged cars had increased significantly since the ordinance was adopted. 265 N.W.2d at 754. In doing so, we cited *Worthington v. Everson*, 10 Ohio App.2d 125, 226 N.E.2d 570 (1967), which held that a similar nonconforming use had been maintained, even though the number of salvaged cars had increased from thirty-three to over 400. The key was that "the land use is not being changed in nature."

An increase in business alone does not constitute an illegal extension of a nonconforming use. *Id.* at 127, 226 N.E.2d at 571. Similarly, the Maryland court held in *Kent County Planning Inspector v. Abel*, 246 Md. 395, 405, 228 A.2d 247, 252 (1967), that "intensification of a nonconforming use is permissible *so long as the nature and character of the use is unchanged and substantially the same facilities are used.*" (Emphasis added.) It is said that

> [t]he prohibition of a zoning ordinance is directed to new uses; it imposes no restraint upon broadening the scope of an existing use. The distinction is between

an increase in the amount of business, even a great increase, which does not work a change in use, and an enlargement of a nonconforming business *so as to be different in kind in its effect on the neighborhood.*

McQuillin, § 25.207, at 116 (emphasis added).

In an Ohio case relied on by our court in *Central City*, the court drew an analogy to a grocery store:

> Nonconforming use restrictions apply to area rather than inventory. While an increased number of junk cars in an agricultural area is extremely undesirable, such an increase is no different principle from the increased inventory of a grocery store in a residential area if the structure or area actually used in the complete operation of the business is not enlarged or extended after the enactment of the zoning resolution.

*Central City*, 265 N.W.2d at 754 (quoting *State ex rel. Zoning Inspector v. Honious*, 20 Ohio App.2d 210, 211, 253 N.E.2d 301, 302 (1969)).

We take this analogy a step further here. If a grocer or other merchant is storing and selling merchandise of one type, his status as a nonconforming use should not be lost if he changes to another type of merchandise so long as the impact of the business on the neighborhood remains the same. We believe the same principles apply here.

The key is that the present use must not be "substantially or entirely different" from the original use. In that respect, "not every change in particulars or details in the method of a nonconforming use or in equipment, object or processes, in connection therewith constitutes an unauthorized change in the use." To illustrate, "a manufactory use relative to one product may be changed to the same use as to another product" and "a storage use as to one commodity may be changed to such use as to another commodity." The question is whether the current use is different in kind

in its effect upon the surrounding area. McQuillin, § 25.202, at 90–91.

■ This case is in equity, and our review is therefore de novo. Iowa R.App.P. 4. When the evidence in this case is examined, we believe that East Lane Manor has retained its status as a legal nonconforming use. There was no evidence of a material change in the structure itself, nor was there any substantial showing of an adverse impact on the neighborhood. It was not shown that the present use increased traffic in the area or increased the demand for public services.

No acts of violence by the residents have been reported. While one of the residents was apparently involved in a shoplifting incident, the evidence was that the incidence of such acts was no greater among the residents of East Lane Manor than among the community generally. Cunninghams testified that, if a resident exhibits signs of possible violence, that resident is immediately transferred to a mental health facility.

East Lane Manor was, and still is, a care facility for disabled persons. The fact that the nature of their disabilities has changed since 1971 from impaired mental functions through aging processes to those caused by mental illness is not enough to constitute a use "different in kind in its effect on the surrounding area." *See* McQuillin, § 25.202, at 91.

Iowa Code section 414.22 mandates that cities allow facilities with up to eight "developmentally disabled" persons, including those suffering from mental or nervous disorders, in residential areas regardless of any zoning restrictions. The purpose is to "integrat[e] them into the mainstream of society by making available to them community residential opportunities in the residential areas of this state." Iowa Code §§ 414.22(1), (2). While our holding is based on East Lane Manor's status as a nonconforming use, not on section 414.22, allowing these residents to remain in East Lane Manor as a nonconforming use is at least consistent with the philosophy underlying that statute.

We hold that the district court erred in ordering the injunction and therefore reverse and remand for dismissal of the petition.

REVERSED AND REMANDED.

All justices concur except SCHULTZ, HARRIS and ANDREASEN, JJ., who dissent.

SNELL, J., takes no part.

SCHULTZ, Justice (dissenting).

I disagree with the majority finding that the nursing home's present use is merely an increase in its business of caring for the mentally infirm. The evidence clearly shows that there was a drastic change in the type of resident cared for in the home. Former employees testified that between 1982 and 1985 the elderly residents were replaced by younger patients with violent tendencies. When the ordinance was enacted, the home had residents with some mental problems, but the primary reason for their care was their age. Now, the younger residents require principally care for their mental conditions. Thus, I believe there has been a qualitative, as well as quantitative, change in the home's resident population.

The nursing home's present use does not predate the ordinance to qualify as a legal nonconforming use. I also find no merit in appellant's other claims. I would affirm the trial court.

HARRIS and ANDREASEN, JJ., join this dissent.